## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT PADUCAH
## CIVIL ACTION NO. 5:06CV-P38-R

**ALANDO SUBLETT** *et al.*                                                                **PLAINTIFFS**

**v.**

**HARRY CHRISTOPHER VINSON** *et al.*                                   **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (DN 56). Plaintiff William Evans filed a response (DN 67), to which Defendants replied (DN 68). This matter is ripe for consideration. For the reasons that follow, the Court will grant summary judgment for Defendants.

### I. FACTS

Seven *pro se* prisoners (Alando Sublett, James DeBow, William Evans, Daniel Lindsey, Donnie Ashby, Aaron Burnett, and James Dunn) filed this action pursuant to 42 U.S.C. § 1983 while incarcerated at the Kentucky State Penitentiary ("KSP"). Plaintiffs alleged violations of their state and federal rights "[d]ue to defendants promu[l]gation of policy, which caused plaintiffs to be wrongfully punished by confinement in segregation for an unreliable field urine 'stick' test." Throughout the course of this action, all Plaintiffs except for Plaintiff Evans have been dismissed.[1]

On initial review of the complaint pursuant to 28 U.S.C. § 1915A, the Court allowed the following claims to proceed as to Plaintiff Evans: Plaintiffs Evans' Fourteenth Amendment due

---

[1] The Court dismissed Plaintiffs Lindsey and Sublett as abandoning the action (DNs 25 & 69); dismissed Plaintiff Burnett for failure to prosecute (DN 28); dismissed all claims brought by Plaintiffs Ashby and Dunn on initial review of the complaint (DNs 33 & 34); and dismissed Plaintiff DeBow on his own motion (DN 54).

process claim arising out of the positive stick test resulting in his placement in segregation against Defendant KSP Captain Junior Ross in his individual and official capacity; Plaintiff Evans' Eighth Amendment claim pertaining to his placement in segregation against Defendant KSP Corrections Officers Harry Christopher Vinson and Joe Keene in their individual capacities and against Defendants KSP Procedures Officer Byron Jasis, KSP Deputy Warden of Programs Nancy Doom, KSP Deputy Warden for Security Rick Pershing, and KSP Warden Glenn Haeberlin in their individual and official capacities; Plaintiffs Evans' Eighth and Fourth Amendment claims regarding the reasonableness of the urine tests/selection process against Defendants Vinson and Keene in their individual capacities and against Defendants Pershing, Jasis, and Haeberlin in their individual and official capacities; and Plaintiffs Evans' retaliation claims against Defendants Vinson and Keene in their individual capacities and Defendants Pershing, Jasis, and Haeberlin in their individual and official capacities.

The facts are taken from the verified complaint (DN 1) and its attachments, Plaintiff Evans' affidavit attached to his response to the motion for summary judgment (DN 67, Aff.), and attachments to Defendants' motion for summary judgment. According to these sources, on May 17, 2005, Plaintiff Sublett was given a stick screening urine test by Defendant Vinson and Officer John Doe. Not pleased with the results, Defendant Vinson destroyed Plaintiff Sublett's urine sample and ordered another urine sample from Plaintiff Sublett with Defendant Asbridge as a witness. Plaintiff Sublett was immediately sent to his cell without an opportunity to witness the sealing of the sample or its chain of custody. About 30 minutes later, Plaintiff Sublett was placed in the Administrative Segregation Unit as a result of the "unreliable stick testing."

The next morning, a message was relayed to Plaintiff DeBow, a grievance aide, in reference to the above incident. Plaintiff DeBow conferred with Plaintiff Evans, a legal aide, to assist Plaintiff Sublett. Plaintiff Evans sent a memorandum to Defendants Pershing, Jasis, and Haeberlin requesting the release of Plaintiff Sublett by reason of a due process violation.[2]

On the following day, May 19th, Plaintiffs DeBow and Evans were administered a urine stick test. In the complaint, Plaintiff claims that they were "singled out from among aprox. 140 other inmates in the 'Honor Housing Unit', to submit a 'urine stick test' administered by the defendant Harry Christopher Vinson. . . . such test was witnessed by Joe Keene, confirming those tests performed upon each plaintiff tested (Sublett DeBow and Evans) by Vinson, were all reasoned for 'Reasonable Cause' only."[3] However, as an exhibit to the motion for summary judgment, Defendants attach a May 4, 2005, Memorandum from Defendant Captain Junior Ross, Drug Screen Coordinator, to Captain Jimmy Lamb, Dayshift Supervisor (DN 56, Ex.), which provides:

> Attached is the random list of Drug Screen Inmates for May, 2005. Please assign trained staff to conduct these tests. We are required to test 10% of the population. This list contains 126 names to allow for transfers and releases and still meet the required 84 tests. You need to have the drug-screens completed no later than the 20th. of the month. Please forward all Employer copies of the urine samples paperwork to Administrative Supervisor, The inmate donor gets the green copy, the front blue copy goes with the specimen, and all other copies come to me, Mail Box # 7. Be sure that **Both Officers** sign the form. If your staff need more forms or sample kits, test sticks please have them contact me at the earliest possible opportunity so that I may be able to get more before they run out. If you have any further questions on this matter, please feel free to contact me at EXT. 365.

---

[2]Plaintiff Sublett was released from segregation on May 19th, only two days after his urine sample was sent to the lab for further testing in light of the positive stick test.

[3]A lab report from Aegis Sciences Corporation regarding the May 19th urine test reveals that the reason for collection was listed as "Reasonable Cause" and that the results from the outside lab were negative.

> Note: Starting last month 50% of all drug screens are done by using the (AEGIS) Specimen collection kit and completed by the Lab, the other 50% will be done by using (Redwood Bioteck) test device.

*Id.* Plaintiff Evans' name is listed in alphabetical order on the attached "15% Random List of Active Inmates for May, 2005." In a response to a grievance that Plaintiff attached to the complaint, Defendant Warden Haeberlin advised "that the random list used for drug screens is generated in Frankfort and not by anyone at this facility. . . . Random drug screens are a necessary part of prison life and shall continue in an effort to maintain high level of securing." Plaintiff does not contest that the random list is computer generated in Frankfort.

Following the urine test, Plaintiffs DeBow and Evans were ordered to return to their cells, and about 45 minutes later, they were placed in the "'Super Max' Administrative Segregation Unit (7 Cellhouse)" by order of Defendant Ross based on positive urine stick tests. A May 19, 2005, detention order, indicates that Plaintiff Evans "is being placed in 7 Cellhouse Admin. Seg. for investigation into Illegal Drug Activity within the institution. This action was taken for the Safety of Staff and inmates, and the safe and secure operation of this institution."

While housed in the "Super Max" segregation unit pending further testing of their urine samples from an outside laboratory, Plaintiffs DeBow and Evans were "forced into a nude 'strip search,' hair cut, shave and restricted from their jobs, and all priviliges they had in the General Population and Honor Housing Unit."[4] Plaintiff Evans contends, "All of the plaintiffs in this

---

[4]In response to Defendants' motion for summary judgment, Plaintiff claims as follows:

> [C]ondictions are more restrictive in the unit 7 Cellhouse, Supermax facility than any other form of incarceration in Kentucky, including condictions on its death row and in its administrative control units, although these themselves are higly restrictive forms of solitary confinement.

compl[ai]nt was humiliated and restricted from their regular activities."

On May 24th, Defendant Haeberlin sent Plaintiff Evans a letter advising that the stick tests were under review. On May 27th, Defendant Dunlap reviewed the lab report results, which were negative for drugs. On that date, Plaintiffs DeBow and Evans were released after nine days in segregation.[5]

On June 20th, all Plaintiffs filed a group grievance. On July 4th, Plaintiff Evans "was again subjected to a 'urine test' thirty-eight (38) days [after] his last 'test results' and fourteen (14) days after the filing of their grievance." Defendants produce a July 1, 2005, Memorandum from Defendant Captain Ross to Captain Lamb, the content of which is virtually identical to the May 2005 Memorandum quoted above. Attached to the Memorandum is the random list for drug screens for July 2005. Plaintiff Evans' name is again on the list in alphabetical order. The lab report from Aegis regarding the July 5, 2005, urine test reveals that the reason the sample was collected was "Random" and that the results were negative.

On July 5, 2005, Plaintiffs Evans and James DeBow filed another grievance "in an effort to cease such continued har[]assment."

---

In the 7 Cellhouse, supermax unit, almost every aspect of an inmates life is controlled and monitored. Inmates must remain in their cells for 23 hours per day; a light remains on in the cells at all time, and an inmate is subject to further discipline if he attempts to shield the light in any way to sleep; access is limited to one of two indoor recreation cells; visitation, medical, and psychological services are limited to video conferances only; and almost all human contact is prohibited, besides inmate legal aids, for those placed in the facility.

Plaintiff does not, however, provide these details under penalty of perjury, in his verified complaint, or in his affidavit attached to his response.

[5]Plaintiff Evans advises and the Aegis lab report reveals that although Plaintiff Evans' urine stick test was performed and urine collected on May 19, 2005, the urine sample was not received at the lab for testing until May 26, 2005. Testing was also completed on May 26, 2005.

In his affidavit attached to the response to the motion for summary judgment, Plaintiff Evans further states,

> During the course of this act, I (William Evans) have been subjected to tests on the following dates:  May 19, 2005/Reasonable Cause (Negative Result); July 04, 2005/ Random (Negative Result); September [25, 2005]/ No Reason Listed (Negative Result); March 09, 2008/ Random (Negative Results).  During these dates other tests have been given, however, the defendants would not provide my copies of such tests which result in the 'stick' being negative.

## II. ANALYSIS

**A.     Summary-judgment standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof.  *Id.*  Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof.  *Id*.  If the nonmoving party will bear the burden at trial on a dispositive issue, the nonmoving party must go beyond the pleadings and by his own affidavits, "or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (internal quotation marks omitted, citing FED. R. CIV. P. 56(e)).  If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for

summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). The moving party, therefore, is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* (internal quotation marks omitted). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id.*

**B.     Placement in administrative segregation**

    **1. Fourteenth Amendment**

Plaintiff alleges that as a result of the unreliable urine stick test in May 2005, he was placed in administrative segregation. He reports that upon entry into segregation he was strip searched and given a hair cut and a shave and that for the nine days while in administrative segregation he was restricted from his job and privileges, was in his cell 23 hours a day, subjected to the lights being on at all times, and had limited recreation and almost no human contact.

Plaintiff argues that *Byerly v. Ashley*, 825 S.W.2d 286 (Ky. Ct. App. 1991) supports his claim. In *Byerly*, the Kentucky Court of Appeals held, "Although a prison inmate facing administrative disciplinary proceedings does not have the same procedural safeguards as does a person facing criminal prosecution or even parole revocation, *see Wolff v. McDonnell*, 418 U.S. 539 . . . (1974), fundamental fairness dictates that the evidence relied upon to punish him at least be reliable." This Court will not give this case any weight. First, this Court is not bound by state-court rulings with respect to federal constitutional issues. Second, Plaintiff was not subjected to disciplinary proceedings; rather, he was placed in administrative segregation following a positive urine stick test pending further testing of his urine sample from an outside laboratory. Third, and most important, *Byerly* predates *Sandin v. Connor*, 515 U.S. 472 (1995), wherein the Supreme Court significantly restricted prisoners' § 1983 claims for relief based on issues concerning due process.

In *Sandin*, the Court made a marked departure from its earlier decisions concerning recognized liberty interests, and instead limited due process liberty interests created by prison regulations "to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484 (citations omitted). Noting that punishment of incarcerated prisoners is aimed at effectuating prison management and prisoner rehabilitative goals, the Court found that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Id.* at 485.

The prisoner plaintiff in *Sandin* was found guilty of a disciplinary charge and sentenced to 30 days disciplinary segregation. The Court concluded:

> Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge nine months after Conner served time in segregation. Thus, *Conner's confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction.* Indeed, the conditions at Halawa involve significant amounts of "lockdown time" even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.

*Sandin*, 515 U.S. at 486 (emphasis added).

Although the *Sandin* Court found no liberty interest in the 30-day placement in segregation, more recently, in *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court found that Ohio prisoners possess a liberty interest in avoiding assignment to Ohio State Penitentiary ("OSP"), the state's only Supermax facility,[6] as the totality of the conditions at OSP "imposes an atypical and significant hardship under any plausible baseline." *Id.* at 223. The Court reasoned,

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement

---

[6]"Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population." *Wilkinson*, 545 U.S. at 213.

9

> disqualifies an otherwise eligible inmate for parole consideration. *Austin I*, 189 F. Supp. 2d, at 728. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. *Sandin*, *supra*, at 483, 115 S. Ct. 2293.

*Wilkinson*, 545 U.S. at 223-24. Thus, "[i]n deciding whether changes to an inmate's conditions of confinement implicate a cognizable liberty interest, both *Sandin* and *Austin* considered the nature of the more-restrictive confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence." *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) (noting that while a thirty-day placement in segregation did not implicate a protected liberty interest, there was a question of fact as to whether an "indefinite" placement that had already lasted three years did implicate a protected liberty interest).

Defendants argue that Plaintiff Evans was placed in administrative segregation pursuant to Kentucky Corrections Policies and Procedures ("CPP") 10.2. They maintain that administrative segregation is a relatively brief period of confinement and is a tool for institutions to use "to ensure the safety and security of the institution, the staff or inmate population or pending investigation of an incident." Defendants further argue that KSP is not a "Supermax" facility as described in *Austin* and that while there may be some similarities between a KSP segregation unit and the "Supermax" facility, the most glaring distinction is the limited duration of segregation at KSP.

It is immaterial whether 7 Cellhouse is nominally designated a "Supermax" facility or not. What is material and uncontested is the fact that Plaintiff was placed in 7 Cellhouse under restrictive conditions for a period of only nine days, unlike those prisoners in *Austin* who were segregated in conditions similar to Plaintiff's *indefinitely*. Moreover, Plaintiff fails to

10

demonstrate that his placement in the administrative segregation unit affected the duration of his sentence. *See Sandin*, 515 U.S. at 487 ("Nor does Conner's situation present a case where the State's action will inevitably affect the duration of his sentence.").

While prisoners do not shed all constitutional rights at the prison gate, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin*, 515 U.S. at 485 (citations omitted). Accordingly, the Court finds that Plaintiff Evans' nine-day placement in administrative segregation in 7 Cellhouse was not an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (finding that loss of privileges and placement in segregation does not give rise to a protected liberty interest). As such, Plaintiff has failed to demonstrate the deprivation of a protected liberty interest that would entitle him to the procedural due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and summary judgment will be granted on this issue.

### 2. Eighth Amendment

The Eighth Amendment prohibits cruel and unusual punishment meted in a penal or disciplinary sense. *See, e.g., Harmelin v. Michigan*, 501 U.S. 957, 994-96 (1991) (plurality). However, the Eighth Amendment has actually been applied to protect a wide assortment of interests, including the physical conditions of confinement. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The alleged conduct must reflect an "unnecessary and wanton infliction of pain" to fall within the ambit of conduct proscribed by the Eighth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (citations and internal quotation marks omitted).

A viable Eighth Amendment claim must satisfy an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834-38 (1994). The objective component requires that the deprivation be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ; *see also Hudson v. McMillian*, 503 U.S. 1 (1992). This component is contextually driven and is responsive to "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citation omitted). An inmate must show that he was deprived of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. The subjective component requires the defendant to act with "deliberate indifference" to a prisoner's health or safety. *Wilson*, 501 U.S. at 302-03.

The Court finds that Plaintiff has failed to demonstrate the objective component of the Eighth Amendment. Plaintiff does not allege that he was deprived of "the minimal civilized measure of life's necessities." He has not alleged that he was denied basic human needs, such as water, food, shelter, medical treatment or personal safety. Further, while he indicates that he was subjected to a nude strip search upon entry into segregation, he has alleged no physical injury or other harm as a result of that search. *See Adams v. Rockafellow*, 66 F. App'x 584, 586 (6th Cir. 2003) (affirming grant of summary judgment on Eighth Amendment claim where plaintiff's pleadings failed "even [to] suggest that he was subjected to any physical injury whatsoever as a result of the strip searches"). "'Because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment Claim.'" *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (quoting *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003)). Defendants are entitled to summary judgment on this Eighth Amendment claim.

### C.  Reasonableness of the urine tests/selection process

#### 1. Fourth Amendment

Defendants argue that, pursuant to corrections policy, testing is not a form of punishment, harassment or intimidation and that random selections are made by a computer-generated method.  They assert that this policy is reasonably related to a legitimate penological interest in maintaining a safe and secure prison by temporarily isolating those suspected of drug use and that prison officials must be permitted to anticipate security problems and devise solutions for those problems based upon their knowledge and expertise in the corrections industry.

Plaintiff argues that although his name was among the 126 names on the computer-generated list, he was not one of those 10% or required 84 inmates to be tested during the month of May 2005.  Instead, reports Plaintiff, the reason listed on the Aegis lab report was "Reasonable Cause."  As to the July 2005 testing, Plaintiff alleges that he "was one of those 10% or required 84 inmates to be tested and such reason for testing was **Random.**"  "Then, on September 25, 2005, I was not one of the 10% or required 84 inmates to be tested, as said reason for test **was not listed** as required."  Finally, Plaintiff states that March 9, 2008, "I was again one of the 10% or required 84 inmates to be tested and such test was by reason of **Random**."

"Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, . . . these intrusions must be deemed searches under the Fourth Amendment." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989).  The Fourth Amendment, however, "does not proscribe all searches and seizures, but only those that are unreasonable." *Id.* at 619.  "Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment

13

interests against its promotion of legitimate governmental interests.'" *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). In considering reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The Court will consider this balancing test to determine the reasonableness of the search.

As to the scope and manner of testing, Plaintiff claims that testing is for punishment and harassment purposes. The evidence, however, reveals that a computer in Frankfort generates the monthly list of inmates randomly selected for testing, without any influence from KSP personnel. *Lucero v. Gunter*, 52 F.3d 874, 877 (10th Cir. 1995) ("[Truly] random urine testing of inmates does not violated the Fourth Amendment."); *Thompson v. Souza*, 111 F.3d 694, 701 (9th Cir. 1997) ) ("The requirement of random tests stems from a concern that correctional officials could harass particular inmates by subjecting them to repeated drug tests."). While Plaintiff makes much of the reasons for testing listed on the Aegis lab reports, Plaintiff, nonetheless, concedes that he was on the random computer-generated lists. That KSP officers may have some leeway in choosing 84 inmates from the list of 126 to account for those transferred or released prisoners or that Plaintiff was tested on three occasions in 2005 does not cause the Court to find that the testing process is unreasonable or otherwise allows for repeated harassment by KSP personnel.

In considering the place in which the urine testing is conducted, Plaintiff in no way challenges, or even describes, the place or conditions.

Finally, as to the justification for testing, Defendants assert that the corrections policy of random drug testing is reasonably related to a legitimate penological interest in maintaining a safe and secure prison by temporarily isolating those suspected of drug use and that prison officials must be permitted to anticipate security problems and devise solutions for those problems based upon their knowledge and expertise in the corrections industry.

"[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 545-46. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* at 546-47.

> [T]he problems that arise in the day-today operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 547-48 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (internal citations omitted).

"Because of the prison's security needs, the prisoner's expectation of privacy in his or her body is diminished." *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir. 1986); *Levine v. Roebuck*, 550 F.3d 684, 687 (8th Cir. 2008) ("'[A] prison inmate has a far lower expectation of privacy than do most other individuals in our society.'") (quoting *Goff v. Nix*, 803 F.2d 358, 365 (8th Cir. 1986)). And as judicially noticed by the U.S. Supreme Court, "the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country."

*Block v. Rutherford*, 468 U.S. 576, 588-89 (1984). The Court, therefore, finds that the urine test/selection process in the instant case is reasonably related to legitimate penological interests and that the balance of the privacy and security interests in this case weighs in favor of KSP officials' attempt to maintain a drug-free environment. Defendants are therefore entitled to summary judgment on the Fourth Amendment claim.

### 2. Eighth Amendment

The Eighth Amendment provides a remedy for "calculated harassment unrelated to prison needs." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). "The Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification.'" *Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

For many of the same reasons set forth above, the Court concludes that Plaintiff has failed to meet this standard. Plaintiff's name was on the random list of inmates to be tested in May and July 2005, and he wholly fails to describe the circumstances surrounding the September 2005 and March 2008, tests, including who performed the test, whether stick tests were positive, or any form of harassment. Additionally, Plaintiff has not shown that the alleged harassment was "unrelated to prison needs." As the Court has already found, Defendants have legitimate penological interests in random drug testing. While Plaintiff broadly alleges that all plaintiffs suffered humiliation, he fails to provide details to support this conclusory statement and fails to attribute this humiliation to the urine sample collection in any way. The Court, therefore, concludes that Plaintiff has failed to demonstrate any "unnecessary and wanton infliction of

pain" rising to the level of an Eighth Amendment violation with respect to the urine testing and procedures. Defendants are therefore entitled to summary judgment on this claim as well.

**D.     Retaliation**

Retaliation for the exercise of a constitutional right is itself a violation of the Constitution actionable under § 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). "In a retaliation claim . . . the harm suffered is the adverse consequences which flow from the inmate's constitutionally protected action. Instead of being *denied* access to the courts, the prisoner is penalized for actually exercising that right." *Id.* (emphasis in original).

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Id.*

Defendants argue that Plaintiff Evans was not tested in retaliation for assisting Sublett but was, instead, tested in accordance with the provisions of CPP 15.8. Defendants maintain that this policy for Inmate Selection Criteria states that "[t]esting shall not be used as a form of punishment, harassment or intimidation"; that "any inmate shall be subject to drug testing"; that "[a]t least ten percent 10% of the institutional population shall be tested each month"; and that "[r]andom selections shall be made by a computer generated method."

Plaintiff Evans counters that in performing his duty as a legal aide, he (along with Plaintiff DeBow, an inmate grievance aide) sent a "memorandum letter of complaint" to Defendants requesting the release of Plaintiff Sublett. "However, the following day after the complaint was sent, defendants Vinson and Keene, conducted an unreasonable search upon plaintiffs, which was not consistent with the administrations testing program or training

procedure, a departure from probable cause requirements, and; did not insure the integrity of the sample." Instead, argues Plaintiff Evans, he and DeBow "were chosen from 140 other inmates to be tested and segregated, as confirmed by the reason state as Reasonable Cause."

"[I]nmates have a well-established constitutional right to access the courts." *Thaddeus-X*, 175 F.3d at 391. While "an inmate does not generally have an independent right to help other prisoners with their legal claims," *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *Thaddeus-X*, 175 F.3d at 395 ("Rather, a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts."), "[s]uch assistance is protected . . . when the inmate receiving the assistance would otherwise be unable to pursue legal redress." *Herron*, 203 F.3d at 415. Thus, in this case, only if Plaintiff Evans' assistance was necessary to vindicate Plaintiff Sublett's right to access the courts was Plaintiff Evans' engaged in protected conduct. *Thaddeus-X*, 175 F.3d at 395.

Plaintiff Evans wholly fails to allege, much less demonstrate, that Plaintiff Sublett was unable to file his own complaint/grievance against prison officials regarding his placement in segregation following a positive urine stick test pending confirmation by an outside lab. Although not alleged, even if Plaintiff Sublett was somehow prevented from filing a complaint/ grievance while segregated, Plaintiff Evans' fails to show that *his* assistance, as opposed to Grievance Aide DeBow's or another legal aide's assistance, was necessary to vindicate Plaintiff Sublett's right to access the courts. Because Plaintiff Evans' was not engaged in protected conduct in filing the memorandum for Plaintiff Sublett, the retaliation claim fails entitling Defendants to summary judgment.

The Court mentions that on one occasion Plaintiff Evans also states that he and others filed a group grievance regarding the unreliable stick test on June 20th and that on July 4th,

18

Plaintiff Evans "was again subjected to a 'urine test' thirty-eight (38) days [after] his last 'test results' and fourteen (14) days after the filing of their grievance." "While it is true that a prisoner has a First Amendment right to file grievances against prison officials," *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001), Plaintiff has not established the requisite causal connection to establish that Defendants performed the July 2005 urine stick test on him because he filed the grievance. Rather, the record reflects that Defendants performed the urine test on Plaintiff based on a legitimate penological interest and because Plaintiff Evans' name was on the July 2005, random list of KSP inmates subject to drug screening. It is uncontroverted that random list was compiled in Frankfort by a computer without any influence from Defendants. Further, Plaintiff does not name any Defendant(s) who allegedly tested him or caused him to be tested purportedly in retaliation for filing the grievance. The Court will therefore grant Defendants summary judgment as to this claim.

### III. ORDER

For the reasons set forth more fully above, Defendants Vinson, Keene, Asbridge, Ross, Jasis, Doom, Pershing, and Haeberlin are entitled to judgment as a matter of law. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (DN 56) is **GRANTED**.

A separate Judgment will be entered.

Date:

cc: Plaintiffs, *pro se*
 Counsel of Record
4413.005

19